Good morning, Your Honors. May it please the Court. Elizabeth Richardson Royer on behalf of the Appellant Harinder Singh. I plan to reserve five minutes for rebuttal, but I will watch the clock. This appeal raises a number of issues, but this morning I plan to address the Confrontation Clause violation, the insufficient evidence of a concealment purpose or design for the money laundering count, and then, time permitting, the argument that a constructive amendment of the indictment occurred when the grand jury charged a single overarching money-transferring business, and the government at trial urged conviction on the basis that Mr. Singh ran his own. If the Court has questions about the other claims, of course, I'm happy to answer them as well. As to the Confrontation Clause violation, the District Court violated Mr. Singh's right to confrontation when it prohibited him from introducing extrinsic evidence that a key prosecution witness engaged in negotiation with Mr. Singh. Mr. Singh's defense was that Mr. Singh had not said enough for you to make all the arguments that you wanted to make about bias. I think, if I recall, his denial was less than, you know, full-throated. It was kind of, I didn't understand. So it seems like it left the opening for the bias arguments you're trying to make now. You know, Your Honor, respectfully, I disagree, because there was no evidence about what actually took place in that meeting, allowed into the record. So all we have is defense counsel saying, you know, did you try to hire somebody to kill this witness? And him saying, well, I didn't really understand, and I was afraid they were going to take my money. This very kind of vague question. So the jury, A, might have thought that defense counsel was just throwing something out there, and that's something that the Supreme Court has noted can happen if you're limited to cross-examination and a witness just denies it. And then, so they're limited to, you know, just that evidence, whereas if you had this audio recording in the record, if you were allowed to impeach this witness with this audio recording that shows the length that this discussion went, you know, this is not, it's a very different flavor. It's a very different flavor. And because it went straight to bias and because it wouldn't have taken much time, because it was critical impeachment of a critical witness, it should have been permitted. And even under an abuse of discretion standard, there was an abuse of discretion here in prohibiting that extrinsic evidence from coming out. Is it your position that the trial judge, since you styled this as a confrontation clause issue, had no discretion about how to manage it? The trial judge did not have discretion to preclude any meaningful inquiry into an entire area. What was the trial judge constitutionally required to do in the course of managing this proceeding? I don't quite follow you on that. The trial judge was constitutionally required to permit the introduction of extrinsic evidence as to bias. And if you look at Davis v. Alaska, that case is really directly in point to this issue, because there the Supreme Court made the point that it was not enough under the confrontation clause that the defendant in that case was allowed to ask the witness about whether he was on juvenile probation. The court said very clearly the error occurred when he was prohibited from producing extrinsic evidence to show that fact. And that's exactly the same case here. You know, the court could have limited how many witnesses were called, exactly how much evidence could come in, how much time she wanted to spend on this issue, but not to permit any evidence to be brought in about this murder-for-hire scheme of a key government witness. That violates the confrontation clause. That's a Sixth Amendment violation. If the court – I actually can't see the clock for some reason. Let me just ask, Blanca, can you just give us an update on what the time is? The time is 13 minutes with 11 seconds, and Richard's working on the situation. Okay, great. Thank you. Unless the court has other questions about this claim, I thought I would move on to the concealment claim and the insufficiency of the evidence of concealment. So, 18 U.S.C. section 1956, A1B, requires – this is an element of the offense – that the financial transaction that gives rise to the money laundering charges have been designed, at least at whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity that are being transferred. And in this case, there was no evidence that any purpose or design of these transactions was to conceal any of these assets of the funds. As I read the record, there was – I mean, do you deny that there was no circumstantial evidence of the purpose? I mean, you don't have a confession, but, you know, you had the coded language. You had the monikers. You had the delivery to folks, you know, in parking lots who were not of the same, you know, ethnic group that you would expect if this was a straightforward trial transaction. You have testimony that your client knew that these were drug proceeds. You also have the misrepresentation to the law enforcement officers about what was in the back of the car when he was stopped. Why isn't that in a context where all reasonable inferences go to the government that is evidence of, you know, both effect and purpose? Well, all of the evidence that Your Honor has mentioned and all of the evidence that the government points to shows that the people who were moving this money wanted it not to be discovered. You know, they went to great lengths, and I don't dispute. Because it was drug money, and he knew it was drug money. But that is actually not enough. And in Cuellar, the United States Supreme Court, it was a very similar case there. And the lengths that they went to in this case were slightly larger, but there were actions taken to hide the money that was being transported in that case, drug money, to get it back to drug cartel members. And the Supreme Court said, it doesn't matter how the money is transported. It matters why. And in that case, it was being transported to, you know, send profits to the drug traffickers. And in this case, it's exactly the same thing. How they did it doesn't matter. It's why. And why they transferred this money was, as every government witness said, expert and lay, as the government charged in the indictment. And as there's, you know, there's no evidence to the contrary. The why of why this money was transferred was to repay drug debts and to procure more drugs. That's why. So the how of it doesn't matter. And it's my position. It doesn't matter to whom. Isn't that evidence that a jury is entitled to consider when cogitating on purpose? I think it I think it it it. All that evidence does is describe the ways that people try to avoid detection. It doesn't describe the purpose and the only evidence in the record. And this includes circumstantial evidence of the purpose of these transfers was to get this money back to the drug contacts in California. Once you know that their drug, it's drug money on all these machinations and and furtive actions, a basis for a jury to whom all the inferences go at this point to consume that he acted with the requisite purpose. Well, your honor, there are a number of cases. And I've cited all of them, I believe, in the briefing where courts have found that even where a defendant knows, you know, knows that these are illegal funds and even where they take actions to conceal these funds as they're being transported, that is that is not enough. And here, you know, there are inference that are that are permitted, but they're based on the evidence. It's it's too far for a jury to say that there's a purpose, that the reason these funds are being transferred was to. Well, that's it. That's just seems to me. I mean, he if you're if you're transporting cash and you hide it, you put it in false compartments or you put it under your shirt or whatever and, you know, it's drug money. What else is the purpose? Well, that's I mean, this this court is bound by Cuellar, and that's exactly the fact pattern in that case where the Supreme Court said that's not enough to show a purpose or design of concealment. So, you know, well, I don't see the burner phones, the use of tokens to transfer the money. Those are all much more sophisticated than I think it was. Cash smuggling in a car. I think all of those things also, you know, and below Mr. Singh disputed that the evidence was was sufficient to prove that he knew the funds were derived from an illegal activity. I'm not taking that position here. That evidence was sufficient to show that he knew there was something going on. Now, whether he just thought that how Allah was illegal, like it was in India. Was it sufficient to show that he was the government's evidence sufficient to show that he, in your view, to show that he knew it was drug money? Yes. Yeah, I believe the evidence. No, the evidence. Well, there was testimony that he told he was told it was drug money. So why in a context where we're given all the inferences to the jury? Why don't we kind of stop with that factum? How can you walk away from it? No, I want to go back to my original answer, which is, yes, that evidence is. However, it doesn't matter for this claim because that's not enough. So he could know that the that the the proceeds are drug money. He could know that they're taking all these steps because they don't want to get caught. That does not mean either that there is a concealment purpose, meaning that's why these funds are being transferred or that he knew of it. And then there's sort of the third, you know, even he personally participates in the concealment. How can you say he doesn't know of the concealment purpose? I don't follow that. Well, and I think what I was just going to get to kind of goes to your point is that even if the court believes that there's a concealment purpose and even if the court believes that he knew that that was one of the purposes driving these transfers, that's not enough. And it has to show that he had the specific intent to further that concealment purpose. And here, you know, he really was a courier for most of the period during which this scheme was taking place. There's no evidence that he had any, you know, any desire for anything to happen other than him picking up money at point A, taking it to point B and his work so that the evidence of specific intent is just totally lacking. Well, that's a very powerful jury argument, but that ship has sailed. Well, it's there. An argument can be a good jury argument and also a good argument about insufficiency of the evidence if there is no evidence of specific intent. You know, you can't there are permissible inferences, but they have to be based on something. They have to be extrapolated from something. And just to pull them out of thin air, which I think would pull them out of thin air. They will prove what your opponent would say is that they were proved by circumstantial evidence, which is while most lots and lots of propositions in criminal cases approved by circumstantial evidence. I agree with that completely, Your Honor. I just think that in this case, the evidence about his role didn't support that finding, but I will reserve the rest of my time for rebuttal. Okay, very good. We'll hear from counsel for the government. May it please the court. Ilana Artson on behalf of the United States. I'd like to begin with why the district court did not abuse its discretion in precluding extrinsic evidence about what was supposed murder for hire plot. And I'd like to begin with looking at exactly what it is that the district court permitted and excluded. First of all, this is not a situation where cross-examination on a topic was entirely excluded. Wadhwa was cross-examined on this point. The defendant asked him about the meeting that he had had with the undercover agent, asked about whether they had met, whether he knew that Taryn, the supposed victim, was cooperating. And then asked, which Wadhwa denied, offering payment to have Taryn killed. Why wouldn't counsel for the defendant, though, at that point be entitled to impeach him if in fact there are these tapes that show that he just lied on the stand when he issued this blanket denial? Why in the world wouldn't he be entitled to impeach Wadhwa with that evidence? So I have two answers to that, Your Honor, and first I'd like to finish my answer to what it is that the district court excluded. The district court did not exclude evidence of bias. Bias is relationship to a party that might give that witness an incentive to slant testimony toward the government. The district court did not exclude questioning about whether the witness believed that he might be prosecuted for this murder for hire, whether he had been promised that he would not be prosecuted for this murder for hire, whether there had been any discussions. There was no ruling from the district court precluding any of those questions about bias, about whether there was some fear that he prosecuted, all of those areas, they were not precluded. The defendant simply chose not to ask about that. So all we're left with is a mini trial about whether this event that the government did not believe occurred, whether it actually occurred. And the district court did not abuse its discretion there for several reasons. First of all, in Ray, this court made the point that an evidentiary showing is required that the alleged witness misconduct actually occurred and that it's relevant to bias. And that really didn't happen here because... Because what, the tapes don't show conclusively enough that there really were these discussions or what's your position on that? Well, what the district court pointed out, which is an important difference here, the dispute here was not about whether these facts happened. The defense wanted to go through 29 parts of the meeting with the undercover and say, did this event occur? Did this event occur? Did this event occur? And the district court said, look, the witness isn't disputing that these events happened. It's the interpretation of these events that is problematic because the witness says, I didn't understand what was going on. I thought they were trying to steal my money. I thought there was a hit on me. And there was no dispute here that the witness was testifying through an interpreter. There was no dispute that he didn't speak English and there was no dispute that this meeting took place in English and there was no interpreter there. So to have a mini trial, which was not relevant to bias, it may have been relevant to credibility in some somewhat tangential sense. And this is why we cited the Hayes case because, again, the inference that's being drawn here is not about bias. That was not precluded. What was precluded is, well, if he wanted to reduce his sentence badly enough or avoid a sentence badly enough that he'd be willing to murder this witness, then he would be also willing to lie about the defendant to reduce his sentence. But the jury already had that information. The jury already knew that he was in prison, that he had been approached at the time he was in custody about cooperating, that he clearly was looking to reduce his sentence, that he had made these statements about the defendant, these incriminating statements about the defendant for the first time when he was in custody. So we're talking about a marginal difference here. And that's the point that Hayes made. There's not an abuse of discretion when the jury really has the bulk of the information about why they might question the credibility of the witness. And this little extra bump, it was not an abuse of discretion in light of the huge distraction that such a mini trial would have been. And it would not have been a small thing. So. But Ms. Richardson told us during her presentation that this is this is a confrontation issue that's not reviewed for abuse of discretion. What's your what's your position on that? Well, first of all, our position is it should be reviewed for plain error because the confrontation clause issue was never squarely raised in the district court. I looked through the transcript and I did not find the word bias used there. There was one reference to confrontation clause. You know, I have a right to confront witnesses and impeach their credibility in the government's view. That is not how many how many do you need? Well, it's not a question of how many references it's does that reference really clearly define the issue that is on appeal now, which is was it was the confrontation clause violated by precluding evidence of bias. And in our view, that issue was not squarely raised. But under any standard of review, there's three factors we look at under the confrontation clause, how how relevant the evidence was. And and again, for all the reasons that I've described, this was not an extremely relevant inquiry. And we would rely in part on the McCoy case. And and there this court said, when you have a cooperator who is continuing to engage in activity in violation of their plea agreement, but the government is unaware that that informant is dealing drugs without authorization. And there's no evidence that the government overlooked it in some way as a benefit, that it goes only to credibility and it is not an abuse of discretion to exclude it. And that's the situation we have here. The second factor is whether there are strong countervailing interests. And there absolutely were here because this was this would have been a huge time consuming distraction to go through all 29 of these parts of the of the meeting, which was over an hour. I think it was at least an hour and 15 minutes, according to the part of the record that we do have, which is the defense counsel's description of these 29 passages that he wanted to review. And then we would have to have FBI agents come in and give all of the rest of the background of the investigation and why in the end there was just nothing there. What happened was I think the government did the responsible thing there. They got word that a jailhouse informant had said, hey, my cellmate is is telling me that he's interested in hiring somebody that hit a witness and the government investigated it and nothing came with it. Counsel, do you agree with the opposing counsels that said that he said that Mr. Water didn't there's no evidence of the record to show that Mr. Water knew that the investigation was closed against him. I mean, I think there were some references to the fact that he. You know, he knew about the investigation. I don't think there was anything specifically in the record, showing that he knew that he wasn't prosecuted. But again, the district court never precluded that evidence. The district court never precluded the defendant from asking, were you ever promised you wouldn't be prosecuted? Were you afraid you would be prosecuted? Did you try to negotiate whether you would be prosecuted? The district court did not exclude any of those statements or any of those questions. It was only trying to prove the actual event through extrinsic evidence that the district court excluded. And, you know, the third factor under the confrontation clause is whether the jury had sufficient information to assess credibility. And in the government's view, the salient fact, which was that he was trying to reduce his sentence by cooperating, was already before the jury. But I'd also like to spend a few minutes talking about why, even if there was a confrontation clause error, it was harmless. Because everything that Mr. Wadhwa said on the stand was abundantly corroborated. He said that the defendant was collecting and delivering money for him and for Mr. Ishbunani. That was established in spades on the wiretap. For example, at ER 774-780, Wadhwa tells Taran, I'm sending the defendant, give him one petty, which is $100,000. And then Mr. Wadhwa says, can the defendant come in an hour because he's making a delivery now? Mr. Wadhwa said he paid $200 per $100,000. That was the same thing that Mr. Ishbunani said at GER 568. Mr. Wadhwa said he told the defendant to change his SIM card in his phone every 20 to 25 days. Mr. Ishbunani said the same thing, use burner phones, change your phone after deliveries. That's at GER 551 to 597. Mr. Wadhwa testified that he told the defendant to do the deliveries outside because this was dangerous work. That was corroborated in spades through surveillance of the defendant in parking lots, meeting in cars, moving cars, making money drop-offs and pickups in parking lots. We also had a wiretap at ER 793 in which Taran tells Wadhwa, the money that you want me to give defendant, I'll give it to him. The defendant can take it from anywhere. And that was very important because, remember, in the black koala, we were meeting people in parking lots, but within our own network, it's okay for the defendant to come to my house. With respect to the knowledge of illegal source, that was also in spades. The concealment methods, the burner phones, the monikers, the huge amounts of cash, $800,000 going to Gory, a white person in defendant's ledger. The fact that he lied when he was caught. We have a wiretap at ER 820 where the defendant tells Taran they're discussing some instructions from Bobby, and the defendant says the money pickups need to be behind the curtain, hidden. And Taran agrees this business is about being behind the curtain. How was his knowledge that this was drug money corroborated? It seemed to me the evidence of that was far from overwhelming. Well, first of all, with respect to knowledge of the drug source, for money laundering at trial, the government only had to prove that the money actually derived from specified unlawful activity and that the defendant knew that it was some type of unlawful activity, but not specifically drugs. That being said, there was substantial corroboration of Mr. Wadhwa's testimony that he told the defendant it was drugs, because Taran testified that Wadhwa told him the same thing. And then there were two wiretap calls that were also significant. One was Sucha on the wiretap. And remember, Sucha was the defendant's uncle who brought him into the conspiracy. And after the arrest, when the other conspirators are trying to figure out what to do about the fact that the defendant has been arrested with all this money, Sucha says on the wiretap, the problem is drugs. There's also... Well, why do you think the government's proof of purpose was adequate, was sufficient? And now we're moving to the concealment money laundering. Yeah. So, there you are. I think there are two aspects of QUAIR that are important here. The first is that concealment... The transaction only needs to be designed in part to conceal. It can be more than one purpose. So, the question is not whether the traffickers needed to get money to L.A. to pay their suppliers. The question is, the why question, is why use Hawala transfers to do so? And there was overwhelming evidence that the reason to use Hawala transfers was, in part, to conceal a listed attribute. Which one? I think many of them. I think source, nature, location. Again, we're talking about, you know, we had expert testimony looking at all of the aspects of Hawala that are attractive to drug traffickers. The multiple layers through which the money passes, the anonymity of the transactions, the lack of regulation. And then we look at the aspects of black Hawala that are present here. The huge amounts going beyond the... I don't see the effect of the transaction as being any different from if the defendant had just, you know, flown up to Canada, taken physical possession of the money and had driven it down to L.A. himself and delivered it to whomever, you know, the drug cartels designated as the recipient. To me, from a money laundering standpoint, there's no difference between using this means of transfer versus just a regular cash smuggling operation. Well, the difference is you drive up to Canada and you physically have the money and you drive it from one place to another. There's no break in the possession of that money. The whole point of Hawala is that it breaks... Well, at least one of the ways that Hawala is designed to conceal is that it breaks that chain. But it doesn't. That's my point. It doesn't. The money goes in dirty and it comes out dirty on the other end and everybody knows where the money came from. It's drug proceeds and it's being used to pay for drug debts. And that the whole purpose of the transfer is to make sure that the recipient knows from whom it came and what its source was. So there's no concealment of any of the listed characteristics in the statute from what I can tell. Well, Your Honor, in every money laundering case, you want the recipient to get the money. I mean, to me, this is no different than... No, no. The money laundering case is where you disguise something about the nature of the money. Usually because you want to get drug proceeds into the legitimate financial system so that you can use it. Well, I think Cuellar made clear that that's one type of money laundering, but that's not the only type of money laundering. And this is really not very different from what happened in like Wilkes where you have bribe money and it goes through a bunch of accounts and then it's used to pay off a mortgage. And Hawala works the same way because you have money that's given to somebody in one place. And then in another place, you have a lot of people collecting money from various sources and delivering them to the ultimate recipient. And that makes it very difficult to trace the ownership, the location, the source of all of these drug proceeds. Because the money isn't going... There's no record of it. The money isn't going anywhere directly. It's going through this very indirect route. Yeah, but the same is true if he just drives the money and takes a lot of precautions, as in Cuellar, to ensure that nobody detects the fact that the money is moving from point A to point B. Well, I think there's a critical difference between Cuellar and this case. Cuellar was under the transportation prong. This case is under the financial transaction prong. And even though that idea that you need to have the purpose and not just the effect applies, the problem in Cuellar is why was the money being transported across the border to Mexico? And the only reason for doing that was to pay the traffickers. Here, we're looking at the financial transaction. And is this financial transaction designed in part to conceal? And the answer to that, I would submit, is overwhelmingly yes, in part. We're using this method to pay the traffickers, the suppliers, because... Because it's cheaper, right? And it's safer. That's why they do it. I thought there was testimony that if you wanted to pay somebody to drive this amount of money, it would cost way more than the small percentage that was being charged by the HALA folks. And that is true. But the question is, is this method designed in part to conceal? And did the defendant know that? It's not concealing anything from any of the players, though. That's what I guess I did. But you're stealing it from the government. And that's part of what money laundering is about. That's what was going on? So let me just ask you, if, in fact, our defendant just drove the money down, physically took it, are you saying that he's guilty of money laundering in that scenario as well? No, I don't think so. I think that it's the attributes of HALA that make it incredibly difficult to trace are why it's designed and used to conceal. Because there are so many layers in it that are designed to conceal. And again, and we saw that with the burner phones and the monikers and the use of the tokens that show that defendant was aware of this design. And, you know, as well as his statement that I indicated earlier about how the transactions need to be hidden, to which Taryn agreed. Okay. You are just about out of time. We have a few seconds left, so unless there are any other questions on any other topic, the government submits that the conviction and sentence should be affirmed. Okay. Thank you very much. We have some time for rebuttal here. Thank you, Your Honors. I have four points that I'd like to touch on, and I'll try to do them briefly. The first has to do with the Confrontation Clause cases that the government pointed to, and we've addressed these in our briefs. But Hayes and McCoy, neither of those cases is analogous to this one. In Hayes, the additional evidence that was excluded went to the same bases for the bias. All the evidence had to do with this witness's immunity agreement. And here, it's different. Here, he had an immunity agreement. That came out, as the government points out. But the additional motivation of this murder charge hanging over his head didn't come out. That case is really different from this one. And in McCoy, the government did not know about these activities that the witness continued to engage in. Here, the government obviously did because the FBI investigated and put an undercover agent into the situation. This case is much more like Ray, where there was continuing legal activity of the witness, and the government knew about it. And in that case, this court held that there was error. The government argues that plain error should apply to the Confrontation Clause claim. The defense raised the Confrontation Clause claim below. The government acknowledged it, referring to the defendant's right to confrontation. The defendant referred to bias repeatedly. At page 12 of the opening brief, we list the numerous instances where the defendant talks about the bias in this case. Didn't always use the word bias. What do you make of Ms. Artson's argument that the judge did not preclude Mr. Singh's counsel from asking questions about bias directly? Did you know about the investigation? Were you worried about being charged? So how does that not solve the problem? In Davis v. Alaska, the Supreme Court said, While counsel was permitted to ask Green whether he was biased, including asking him whether he was worried about charges, counsel was unable to make a record from which to argue why Green might have been biased, or otherwise lack that degree of impartiality expected of a witness at trial. And that's exactly what happened here. Once he made that denial, and defense counsel was prohibited from introducing any evidence to cast doubt on it, there wasn't anything to be gained by defense counsel asking whether this witness was afraid of charges for something he denied even happened. And so just so that I'm clear, it's your position that this particular ruling is not reviewed for abuse of discretion? That's right, Your Honor. Although I don't think that changes it here, because I think even under that standard of review... It's reviewed. This is an evidentiary call in the middle of a trial that you were suggesting we review de novo. That's your position? Yes. Because this evidentiary ruling led to a denial of the Sixth Amendment right to confrontation. I just wanted to put... There was some question about what the witness knew about the FBI agent's investigation. I maintain, again, there's nothing in the record indicating that he knew the investigation ended. And the only evidence of what he was told in the record is at ER 55. And this is defense counsel, I believe, explaining what happened. Quote, the agents admonished him, told him, we're going to look if anything happens to Terrence saying we're coming after you. And that's where it ended. So this is really far from a situation where he was assured that everything was fine and he wouldn't face charges. The final point I want to make is just on the issue of harmlessness on the Confrontation Clause claim. It's the government's burden to prove harmlessness beyond a reasonable doubt. So the fact that the government can point to certain evidence and say there was remaining evidence in the record, it's not a sufficiency standard. It's beyond a reasonable doubt standard. It doesn't matter whether the evidence is sufficient. And two things I think that the government has never adequately addressed are its heavy reliance on Wadhwa's testimony in closing and the jury's request for a readback of that testimony. The government has not. The Confrontation Clause doesn't permit counsel to ask anything he or she wants, does it? It doesn't, Your Honor. You've got the witness on the stand. You confront the witness. You can question him. But it's your position that once that witness is up there, the Confrontation Clause permits defense counsel to take an hour, a day, a week, questioning the witness on bias or something like that? No, Your Honor. The trial court is well within its rights to place reasonable limits upon evidence in a particular area. And we always review those for abuse of discretion, right? Yes. But where the court precludes all evidence into a particular area, that implicates the Confrontation Clause. And that claim is no longer reviewed for abuse of discretion. So if an area is closed off, it's a Confrontation Clause issue. If an area is compressed or limited, it's an evidentiary ruling that's reviewed for abuse of discretion. Is that what we're hearing? That's exactly right, and that's exactly what an en banc panel of this court held in United States v. Larson. Okay. Thank you, counsel. Very interesting argument. Thank you both.
judges: Parker, Watford, Bumatay